NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA OVERTON, MERRIBETH BAZZELL, and KAREN FULLER, individually, and on behalf of all class of similarly situated individuals,<br><br>      Plaintiffs,<br><br>v.<br><br>SANOFI-AVENTIS U.S., LLC d/b/a SANOFI US,<br><br>      Defendant. | Civil Action No.:  13-5535 (PGS)<br><br>**MEMORANDUM AND ORDER** |

   This matter is before the Court on a motion to dismiss plaintiffs' First Amended Complaint by defendant sanofi-aventis U.S., LLC ("sanofi")[1] pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. [ECF No. 15.]  For the reasons that follow, defendant's motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

   The Court finds that the following are the well-pleaded allegations of the First Amended Complaint ("FAC").

**I.  The Parties**

   Plaintiff, Lisa Overton is a Virginia citizen who resides in Glen Allen, Virginia. At all relevant times Plaintiff Overton was employed by sanofi as an Oncology Key Account Lead for the Washington D.C. sales territory.  (FAC, ¶ 2.)

---

[1] Defendant, sanofi, has not capitalized its name in its briefs; the Court will therefore utilize the capitalization that the Defendant has used in describing itself.

Plaintiff, Merribeth Bazzell is a Louisiana citizen who resides in Mandeville, Louisiana. At all relevant times Plaintiff Bazzell was employed by sanofi as Senior Clinical Product Specialist, Oncology, for the New Orleans territory.  (FAC, ¶ 3.)

Plaintiff Karen Fuller is a Wisconsin citizen, who resides in Wales, Wisconsin. At all relevant times Plaintiff Fuller was employed by sanofi as Senior Clinical Product Specialist, Oncology, for the Milwaukee territory. (FAC, ¶ 4.)

Defendant sanofi is a Delaware limited liability corporation. Sanofi maintains its headquarters and principal place of business at 55 Corporate Drive, Bridgewater, New Jersey. (FAC, ¶ 12.)

## II.     Factual Allegations In Support Of Claims For Relief

After hiring, Plaintiffs claim that they underwent training, meetings, and a "credentialing" process through sanofi's New Jersey office.  (FAC, ¶¶ 5-7.)   Plaintiffs and purported Class Members were employed by sanofi to, among other things, promote and sell Zaltrap®, which was being launched in the United States in or about August 2012. (FAC, ¶ 14.) According to sanofi, Zaltrap® was developed and intended to "be used in combination with the chemotherapy regimen 5-fluorouracil, leucovorin, and irenotecan-(FOLFIRI) to treat metastatic colorectal cancer that has progressed during or after treatment with other anti-cancer medicines." (FAC, ¶ 13.)

Plaintiffs and the purported Class Members received at least some of their compensation through the sanofi Incentive Compensation Plan ("IC Plan"). (FAC, ¶ 15.) More specifically, with respect to sales of Zaltrap®, the compensation structure was communicated to the purported Class Members by their respective district managers on or about August 31, 2012. (FAC, ¶ 16.) This included what the Plaintiffs have termed the "uncapped pay-per-vial" incentive.  (FAC, ¶ 16.) Pursuant to this provision, each purported Class Member would be paid compensation based upon

the number of vials of Zaltrap® they sold, with the "per-vial commissions" established at the outset. (FAC, ¶ 16.) Plaintiffs claim that this compensation was presented as, and served as, a significant motivating factor for sales of Zaltrap® made by the purported Class Members. (FAC, ¶ 16.)

Plaintiffs claim that the "per-vial compensation" structure was further confirmed, including during the Zaltrap® launch meeting for the week of September 10, 2012. (FAC, ¶ 17.) Plaintiffs further claim, upon information and belief, that the purported Class Members were not advised that the agreed-upon "uncapped pay-per-vial" compensation structure was not actually "uncapped," nor were they referred to the Incentive Compensation Plan Policy ("ICPP"); in fact, Plaintiffs assert, upon information and belief, that some of the purported Class Members were never provided with the ICPP. (FAC, ¶ 17.)

On or about September 13, 2012, sanofi's district managers communicated the specific per vial compensation rates for the district and territory levels to the purported Class Members. (FAC, ¶ 18.) Plaintiffs also allege that the "per-vial compensation" rate was based, at least in part, on the market potential for that purported Class Member's particular territory. (FAC, ¶ 18.) Plaintiffs further assert, upon information and belief, that the incentive compensation to the purported Class Members, including District Managers and/or other supervisors, was also to be based, at least in part, on the per-vial commission amounts. (FAC, ¶ 18.)

Plaintiffs claim that, following the launch of Zaltrap®, sanofi management continued to confirm that the compensation would include an "uncapped pay-per-vial commission." (FAC, ¶ 19.) Plaintiffs further allege that sanofi management knew very quickly that the forecasts relied on to set the commission rate and compensation for Zaltrap® had underestimated the purported Class Members' sales potential. (FAC, ¶ 20.) More specifically, Plaintiffs allege that sanofi's

3

internal sales data demonstrated the sales of Zaltrap® in September 2012 were more than double the amount forecasted and October sales of Zaltrap® were more than quadruple the forecasted sales for that month. (FAC, ¶ 20.) Nevertheless, Plaintiffs claim that sanofi management continued to confirm, throughout this and all relevant periods, that commissions and compensation would be paid as represented and agreed. (FAC, ¶ 20.)

Plaintiffs allege that on November 6, 2012, an internal conference call was held with the management team overseeing Zaltrap®. During that call, Plaintiffs allege that sanofi announced that it had decided to discount Zaltrap® by 50% to the prescriber (not the patient) and explained that the discount was being provided to increase patient access to the product. (FAC, ¶ 21.) Plaintiffs further allege that sanofi management confirmed that there would be no changes to the "uncapped pay-per-vial" commissions. (FAC, ¶ 21.) Plaintiffs further assert that this assurance was conveyed to the purported Class Members. (FAC, ¶ 21.)

Plaintiffs allege that, also on November 6, 2012, they and the purported Class Members received an email directly from Paul Hawthorne, who was the Head of Oncology PCU (Patient Centered Unit) confirming that sanofi was reducing the amount charged for Zaltrap. (FAC, ¶ 22.) Hawthorne indicated that sanofi decided to take "immediate action across the oncology community to reduce the cost of therapy and to remove barriers to access for any patient who may benefit from Zaltrap." (FAC, ¶ 22.) Hawthorne went on state, with respect to the Zaltrap product launch:

> You should all be very proud of the impact you have had on the lives of metastatic colorectal cancer patients and their families. Since we introduced Zaltrap in late August, we have seen strong sales and uptake in the marketplace, which is a tribute to this entire team.

(FAC, ¶ 22.)

Plaintiffs allege that the purported Class Members were repeatedly assured during the

4

purported Class Period[2] that they would be paid the full amount of compensation, regardless of the volume of sales of Zaltrap®. (FAC, ¶ 23.) For example, in January 2013, at least one regional manager contacted Rick Schirmer, who was the Vice President of Oncology Sales, to again confirm that the full compensation for Zaltrap® would be paid for the July 2012 through December 2012 time period. (FAC, ¶ 23.) According to Plaintiffs, Schirmer confirmed that the compensation would be paid in full. (FAC, ¶ 23.) Plaintiffs claim that this information was then disseminated to the purported Class Members. (FAC, ¶ 23.) Thereafter, Plaintiffs claim that from the period beginning in January 2013 to mid-March 2013, Schirmer repeatedly confirmed that sanofi would abide by its agreement and pay the full compensation due. (FAC, ¶ 24.) Plaintiffs allege that they relied upon these representations and expected to be paid their full compensation on or about March 22, 2013. (FAC, ¶ 24.)

Plaintiff Karen Fuller claims that she first became aware of the ICPP when she located it on sanofi's intranet after the 3rd quarter 2012 payout. (FAC, ¶ 25.) Upon discovering the ICPP, Plaintiff Fuller alleges that she specifically confirmed with her superiors that she and all purported Class Members would be paid based on the agreed-upon uncapped pay-per-vial structure and would not be limited by any 250% cap. (FAC, ¶ 25.) Plaintiff Fuller further asserts that one of her superiors advised her that during his annual performance review, Schirmer confirmed that sanofi would be honoring the agreed-upon uncapped pay-per-vial compensation structure and all class members would be paid in full at the fourth quarter payout. (FAC, ¶ 25.)

During a mandatory conference call on March 21, 2013, the purported Class Members were

---

[2] The Class Period has been challenged by the Defendant in the instant motion. Defendant has argued that the Class Period should be limited to the second half of 2012, and not include the first quarter of 2013, which would therefore mean that the communications mentioned in the remainder of this paragraph would not fall within the Class Period. Nevertheless, for the purposes of this Statement of Facts, the Court utilizes the Class Period as defined by Plaintiffs in the FAC.

5

advised that sanofi was not going to pay the full amount of compensation allegedly owed. (FAC, ¶ 26.) Plaintiffs claim that no legitimate basis was presented for this decision. (FAC, ¶ 26.) According to the Plaintiffs, this decision was described as a "philosophical" decision, based in part on concerns about how these required payments to purported Class Members would be viewed by the public and doctors, without reliance on or reference to the terms of the ICPP. (FAC, ¶ 26.)

In August 2013, after the purported Class Period, sanofi formally eliminated the uncapped structure in its Incentive Compensation Plan "Roll Out" ("IC Roll Out"). (FAC, ¶ 27.) Specifically, sanofi's H2 IC Plan referenced and incorporated the ICPP and delineated a 250% incentive compensation plan cap. (FAC, ¶ 27.) Additionally, the entire Oncology Field Sales Team was required to certify that they read and understood the quarterly ICPP, as well as completing a "learning module" to ensure their understanding. (FAC, ¶ 27.) Plaintiffs claim that the presentation of this information and these policies were not provided to the purported Class Members during the purported Class Period and were not incorporated into their quarterly incentive compensation plans. (FAC, ¶ 27.)

As to the manner of calculating and reviewing payments under the ICPP, Plaintiffs allege that "Target funding" provision on page 8 of the ICPP does not provide for a mandatory ratio of 75%-25% to 80%-20% between fixed and variable pay in the payments to the purported Class Members. (FAC, ¶ 28.) Reference to these ratios was eliminated from subsequent incentive compensation plan polices. (FAC, ¶ 28.) Additionally, Plaintiffs claim that the compensation owed to the purported Class Members, "is directly related to and commensurate with the employee's performance during the assessment period," as set forth on page 8 of the IC Plan. (FAC, ¶ 29.) They also claim that the compensation allegedly owed to the purported Class Members does not represent, "artificially high attainment," or a "windfall payment," as set forth on page 8 of the IC

Plan. (FAC, ¶¶ 30-31.) Plaintiffs claim that, as a result of sanofi's improper decisions, the purported Class Members have been deprived of compensation and damaged. (FAC, ¶ 32.)

## DISCUSSION

### I. Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir.), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S. Ct. 1091 (2001). The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d §

7

1357 at 340). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal citations and quotations omitted).

Additionally, while ordinarily nothing beyond the four corners of the complaint may be considered on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original)). Additionally, "a district court may examine an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Id.* (quoting *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "The rationale for these exceptions is that the primary problem raised by looking to documents outside the complaint – lack of notice to the plaintiff – is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Id.* (alteration in original) (internal quotation marks omitted).

**II.     Plaintiffs' Claims Under the New Jersey Wage Payment Law**

Plaintiffs have alleged that there was a change in the IC Plan of which they were not

8

notified prior to its effective date, and that because the IC Plan is covered by the New Jersey Wage Payment Law ("NJWPL"), sanofi's failure to notify constitutes a violation of same. Defendant has argued that the ICPP informs the IC Plan and IC Roll Out, and therefore, should be construed along with the IC Plan and IC Roll Out. Defendant has, therefore, included a copy of both the ICPP and the IC Plan with its materials in support of this motion to dismiss. Because plaintiffs rely upon the IC Plan throughout their complaint, and because this Court agrees that the ICPP does shed light on the terms of the IC Plan, this Court will review the copy of the ICPP submitted by Sanofi with its Motion to Dismiss pursuant to *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d at 287.

Defendant has argued that the NJWPL does not apply to the plaintiffs herein because the plaintiffs are not residents of New Jersey and did not work in New Jersey, except for occasional visits to sanofi's New Jersey offices for training. (Def. Reply Br. at 2). Plaintiffs, however, argue that the NJWPL does apply to them because, among other things, they were supervised from New Jersey, they were issued credentials as New Jersey employees, and the address listed on their business cards was the address of the Bridgewater, New Jersey office of sanofi. (Pl. Br. at 7-8).

Few courts have addressed the issue of whether the NJWPL applies to employees who live and work outside of New Jersey, even if the employer is based in New Jersey. Those courts that have addressed the issue have held that the NJWPL *does not* apply to employees based outside of New Jersey. *See, e.g.*, *Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 383 (S.D.N.Y. 2012) (holding NJWPL not applicable to employee who did not work in New Jersey); *Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 231 (S.D.N.Y. 2003) (refusing to apply the NJWPL to a class of plaintiffs whose employer was based in New Jersey, where not all

class members worked in New Jersey); *Redick v. E. Mortg. Mgmt., LLC*, No. 11-1260, 2013 U.S. Dist. LEXIS 36002, at \*12 (D. Del. Mar. 15, 2013) (holding NJWPL was not applicable to Delaware employee of a New Jersey company); *see also Mulford v. Computer Leasing*, 334 N.J. Super. 385, 393 (Law Div. 1999) (applying the NJWPL to an out of state company because its New Jersey employees were affected).

The Court finds the reasoning of these cases persuasive, as they are in line with the governmental interest analysis governing New Jersey's choice of law determinations. *See Veazey v. Doremus*, 103 N.J. 244, 247-48 (N.J. 1986) ("Under [the governmental-interest] analysis, the determinative law is that of the state with the greatest interest in governing the particular issue."). The states where these plaintiffs lived and worked would have the greatest interest in their treatment as employees. *See Vengurlekar*, 220 F.R.D. at 231 ("the purpose of the NJWPL is primarily to protect employees"); *Mulford*, 334 N.J. Super. at 394 ("Employees are the obvious special beneficiaries of the statute."). Therefore, this Court finds that the NJWPL is inapplicable to these plaintiffs, and Count One of the First Amended Complaint seeking relief under the NJWPL is dismissed. Because this Court has dismissed Count One on these grounds, the Court does not reach Defendant's alternative arguments as to the applicability of the NJWPL to the type of compensation

### III. Breach of Contract

Defendant has also moved to dismiss Count Two of Plaintiffs' FAC for breach of contract. The elements of a claim for breach of contract are that: "(1) a valid contract existed between plaintiff and defendant; (2) [defendant] breached the contract; (3) [plaintiff] performed its obligations under the contract; and (4) [plaintiff] was damaged as a result of the breach." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 577 (D.N.J. 2003).

In making the determination as to whether a party breached the terms of a contract, the court must examine and interpret the terms of the contract at issue.  "The process of interpreting a document is potentially a two-step process . . . ." *Stendardo v. Fed. Nat'l Mortgage Ass'n*, 991 F.2d 1089, 1102 (3d Cir. 1993) (quoting *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir. 1987). As a preliminary matter, the court must "determine whether the terms at issue are ambiguous," which constitutes "a question of law." *Id.*  "A term is ambiguous if it is susceptible to two reasonable alternative interpretations." *Id.*  The next step in the analysis, should the court find one or more contractual terms ambiguous, is for the court to interpret the term for the parties.  This is a question of fact.  "The intent of the parties to a contract is likewise a question of fact." *Id.*

    Here, the parties disagree as to which documents constitute the "contract." Defendant posits that the "contract" includes the ICPP, IC Plan, and IC Roll-out formed the contract. However, Defendants also include the ICPP as part of the contract, and Plaintiffs specifically argue that the ICPP should *not* be part of the contract.  This Court finds the argument of Plaintiffs that the ICPP does not apply to them, and is not part of the contract, to be unpersuasive.  First, the plain language of the ICPP states that it was effective during prior to the IC Plan for the second half of 2012, and that it applies "to all Sanofi US sales representatives . . . unless otherwise overridden by a [Business Unit] or franchise specific addendum."  (Loreaux Dec., Exhibit D, at 1.)  Plaintiffs have not alleged that the ICPP was overridden by such an addendum.  Second, Plaintiffs claim that page 8 of the ICPP states that it is not a contract. Plaintiffs' statement is misleading.  The exact wording as it appears in the ICPP is "[t]his document is not meant to, nor does it create an Employee Handbook and/or an Employment Contract between the Company and any employee."  (Loreaux Dec., Exhibit D, at 8.) That

11

paragraph of the Disclaimer goes on to make statements about at will employment and the manner in which Incentive Payments may be made. This does not mean that the document does not constitute a contract; it merely means that it is not an employment contract altering the at will employment relationship between the parties. Therefore, this Court finds that the ICPP constitutes part of the "contract" alleged by Plaintiffs to have been breached.

In addition, Plaintiffs have argued that the e-mails and other communications that were circulated to the Plaintiffs in late 2012 and early 2013 with respect to the incentive payments also cast light on that "contract." More specifically, the claims made by Plaintiffs are that an "'uncapped pay-per-vial' incentive" was to be paid to the Plaintiffs for their work in selling vials of the drug Zaltrap during the second half of 2012, that they were continually assured that they would be paid the "uncapped" amount, and that ultimately, despite Plaintiffs' success in selling the drug, their incentive payments were capped. Defendant has argued that the clear language of the ICPP is at odds with Plaintiffs' claims for damages, as the ICPP contains a Disclaimer that specifically allows for payments which are more than 250% of a "target" payment to be reviewed at the discretion of management to prevent, among other things, "windfall payments."

The plain language of the ICPP is as follows:

> **DISCLAIMER**
>
> All IC payouts in excess of 250% of target will be reviewed by sales leadership to ensure the payout is directly related to and commensurate with the employee's performance during the assessment period and to rule out mitigating factors, such as data volatility, data errors, payout miscalculations, forecasting, error, etc. leading to artificially high attainment and a windfall payout.
>
> This document is not meant to, nor does it create and Employee Handbook and/or an Employment Contract between the Company and any employee. This policy does not guarantee payment of any incentive or other compensation, nor does it guarantee employment for any period of time or any particular terms and/or conditions of employment. The employment

>relationship between the Company and each employee is "at will," which means that either the Company or an employee may terminate the employment relationship at any time, with or without cause or notice. ***The Company, at its sole discretion, may change or terminate the matters described in this document at any time with or without notice, or choose not to apply it in particular cases. Until a payment is actually made, it is not deemed to have been "earned", and the Company retains sole discretion about whether or not to make such payment and about the amount of any such payment.*** In addition, any payment otherwise due will not be paid to any employee or former employee while that person has any outstanding obligations to the Company, including the obligation to return any company property of any kind, or to resolve any AMEX or T&E or other issues of any kind.

(Def. Br. Exhibit D at 8 (emphasis added).)

Earlier in the ICPP, the following language appears:

>***The policies outlined within this document apply to all Sanofi US sales representatives.*** In certain cases management has identified the need to account for BU or franchise specific policies in order to account for conditions specific to those markets and products. These exceptions are outlined in a separate BU or franchise specific addendum to this document. ***All policies outlined in the body of this document apply unless otherwise overridden by a BU or franchise specific addendum.***
>
>Subject to management discretion and to the conditions described below, Incentive Compensation Payment (IC Payment) will be determined based on the performance in a Semester (with quarterly interim payouts) for Semester based IC Plans, and on the Quarterly performance for Quarterly IC Plans. . . . The amount of any IC Payment will be determined according to the criteria in the ICP. These criteria are subject to change at the discretion of Senior Leadership. IC Payments will be made within approximately 90 days after the close of the Quarter unless otherwise scheduled by Senior Leadership. These payments are not deemed "earned" until they are actually made.

(Def. Br. Exhibit D at 1 (emphasis added).)

The ICPP specifically states that payments are not deemed earned until made; that they are incentive compensation, and are subject to change at the discretion of senior leadership at the company; and that payments in excess of 250% of target will be reviewed by sales leadership to prevent windfall payments. Defendant has argued that, had it paid the Plaintiffs per vial, the

13

result would have been a windfall payment to each Plaintiff. Defendant has also admitted that the incentive payments were made, and has repeatedly stated in its moving papers that the only issue actually in dispute between the parties is the amount of the payment made. Defendants specifically reserved the right to review payments and, in their sole discretion, determine the amounts to be paid thereunder.  However, the written communications from sanofi's senior leadership to the parties, as well as the IC Plan, indicate that there is some ambiguity in the contract with respect to the formulation of the incentive payment and the term "windfall payment."  Because the term is ambiguous, there remains a question of fact in determining this term.[3]

On a motion to dismiss, the court must take the well-pleaded allegations of the complaint as true.  For this reason, the allegations as to the communications and assurances from senior leadership at sanofi with respect to the incentive compensation to be paid to the sales teams must be taken as true.  Such communications could indicate that senior leadership did not perceive the per-vial payout as a "windfall payment" or as being based upon "artificially high attainment," regardless of its amount.   Any determination as to modification to the expectations of the parties under the contract would be a finding of fact, and would be based upon the terms of the e-mails and other communications exchanged in late 2012 and early 2013 between senior leadership and sales leadership, and later distributed to field sales personnel.  Findings as to fact based upon breach of contract are beyond the ambit of a motion pursuant to Rule 12(b)(6). *Animal Sci.*

---

[3] Plaintiffs have also raised the question, given the wording of the Disclaimer portion of the ICPP, of whether the Disclaimer language would render all or a portion of the ICPP illusory.  *See Del Sontro v. Cendant Corp.*, 223 F. Supp. 2d 563, 577-78 (D.N.J. 2002) ("New Jersey Courts, in accordance with the Restatement, define an illusory promise as, a promise which by [its] terms make[s] performance entirely optional with the promisor whatever may happen, or whatever course of conduct in other respects he may pursue." (alterations in original) (internal quotation marks and citations omitted)).  Defendant has argued that the language of the ICPP is not illusory, and that the ICPP simply allows for the Defendant to review incentive payments for forecasting error to prevent a windfall payment.  Taking Defendant's argument on its face, the court would still be required to interpret the ambiguous term "windfall payment."  Therefore, the Court does not determine, at this time, whether all or a portion of the ICPP is illusory.

*Prods. v. China Minmetals Corp.*, 654 F.3d 462, 469 (3d Cir. 2011). Therefore, the motion to dismiss with respect to the Count Two is denied.

## IV. Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant has also moved to dismiss Count Three of the FAC, which pleads a breach of the implied covenant of good faith and fair dealing inherent to every contract.  For similar reasons to those set forth as to the denial of the dismissal of Count Two of the FAC, defendant's motion to dismiss Count Three must be denied.

"A covenant of good faith and fair dealing is implied in every contract in New Jersey. That covenant is among the few terms that [c]ourts have been called upon to supply." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (N.J. 2001) (alteration in original) (internal quotation marks and citations omitted). The implied covenants within a contract are no less effective components of an agreement than those expressly stated. *Id.* (citing *Aronsohn v. Mandara*, 98 N.J. 92, 100, 484 A.2d 675 (1984)).  "While the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Id.* (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 419, 690 A.2d 575 (1997)).

In addition, under New Jersey law, even if a party to a contract has discretion to set prices or other items of payment under the contract, that party may nevertheless breach "the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract," because "[s]uch risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial."  *Wilson*, 168 N.J. at 251. Contracting parties "do

not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose." *Id.*

Plaintiffs claim that a communication occurred between at least one regional manager and Rick Schirmer, the Vice President of Oncology Sales, regarding the IC Plan for the second half of 2012 indicated that they would be paid per vial, regardless of the amount of sales made. (See FAC, ¶ 23). They claim that this information was then disseminated to the sales teams. (See FAC, ¶ 23). Additionally, Plaintiffs claim that further assurances from Schirmer as to "payment in full" were given throughout the first quarter of 2013. (See FAC, ¶ 24). Although these allegations are made in the FAC, and although the Defendant has provided the Declaration of Rick Schirmer in support of its Motion to Dismiss, neither Defendant nor Schirmer has denied that such a communication occurred. In point of fact, in a footnote in Defendant's reply brief, Defendant states that irrespective of whether such a statement was made, it is irrelevant because it was received *after* the H2 2012 had closed, and thus would not affect the payment for same.

Taking the allegations as to the e-mails and other communications exchanged between senior leadership and sales leadership/field personnel at sanofi as true, as this Court must on a motion to dismiss, there exists a question of fact as to whether, as Plaintiffs allege, sanofi "breached the duty of good faith and fair dealing by misrepresenting the compensation to be paid, and then without warning or basis, reducing and failing to pay the full compensation," or whether they acted "with malicious motive." (FAC, ¶¶ 63-64.) The Plaintiffs have adequately pleaded their cause of action for breach of the implied covenant of good faith and fair dealing. Therefore, Defendant's motion to dismiss Count Three of the FAC is denied.

### V.  Unjust Enrichment

Defendant has also argued that Count Four of the FAC, for unjust enrichment, should be dismissed.  This argument is premised on the fact that there is an express, written contract, and therefore, as a matter of law, Plaintiffs are not entitled to relief for any alleged unjust enrichment.  Defendant also argues that Plaintiffs have failed to properly allege improper motive on the part of the Defendant with respect to the unjust enrichment claim.

"To recover on the theory of [unjust enrichment] the plaintiffs must prove that defendant was enriched, viz., received a benefit, and that retention of the benefit without payment therefor would be unjust."  *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966).  However, "recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties."  *Van Orman v. American Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982); *see also Meyers v. Heffernan*, 740 F. Supp. 2d 637, 655 (D. Del. 2010).  Nevertheless, "the mere existence of a written contract between the parties does not bar an unjust enrichment claim; if the written document is unenforceable, the plaintiff may have an unjust enrichment claim."  *Meyers*, 740 F. Supp. 2d at 657 (internal quotation marks omitted).  So long as the claim may be pleaded independently of the breach of contract claim, "[c]ourts have recognized the permissibility of alternative pleading and inconsistent claims."  *Id.*  In early stages of litigation, leave may be granted to amend a count of a complaint for unjust enrichment so that the claims are alleged independently of any contract-based claims.  *Id.*

Here, Plaintiffs have properly alleged the elements of their unjust enrichment claim.  However, they have also incorporated by reference, in paragraph 65 of their FAC, "each preceding and succeeding paragraph as though fully set forth at length" therein.  As a result, Plaintiffs have included their breach of contract claims in their unjust enrichment claim.

17

Therefore, this count of the FAC is dismissed without prejudice, and with leave to amend the count within 30 days of the date of this Opinion in order to make the unjust enrichment claims independent of the contract-based claims.  *See Meyers,* 740 F. Supp. 2d at 657.

## VI.  Class Period

In addition to their other arguments for dismissal, Defendants state that the FAC alleges an improper Class Period.  Plaintiffs have alleged a class period through March 31, 2013.  Defendants argue that the Class Period should be limited to the third and fourth quarters of 2012, as "Plaintiffs allege no facts that even plausibly give rise to an entitlement to relief on any claim that they were denied 2013 incentive compensation awards."  Plaintiffs have argued that the same analysis as to the "retroactive change to the commission structure without notice was equally improper for the commission owed for the first quarter of 2013 as it was for the third and fourth quarters of 2012."  (Pl. Br. at 26.)  The Court declines to decide the issue of class period at this time because no motion to certify the class has yet been filed.  This portion of Defendant's motion is therefore denied without prejudice, and Defendant may raise this argument at the time that any class certification motion is made.

## CONCLUSION

Defendant has brought a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  Based upon the foregoing, defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

**ORDER**

It is, on this 23rd day of October, 2014,

ORDERED that Defendant, sanofi-aventis U.S., LLC's motion to dismiss the complaint be and is hereby GRANTED IN PART and DENIED IN PART; and it is further

ORDERED that Count One of the First Amended Complaint is dismissed with prejudice; and it is further

ORDERED that Count Four of the First Amended Complaint is dismissed without prejudice; and it is further

ORDERED that Defendant's motion to dismiss Plaintiffs' claims to the extent that they are tied to the First Quarter of 2013 is denied without prejudice; and it is further

ORDERED that Plaintiffs are granted leave to file a Second Amended Complaint to replead certain allegations in accordance with this Memorandum within thirty (30) days of the date of this Order.

                                                            *s/Peter G. Sheridan*
                                                            PETER G. SHERIDAN, U.S.D.J.

October 23, 2014